## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CHARLES W. BLOUNT,

       *Plaintiff*,

    v.

CARLOS DEL TORO, *in his official capacity as Secretary of the Navy*,

       *Defendant*.

Civil Action No. 21-2446 (TJK)

## MEMORANDUM OPINION

Charles Blount, then a captain in the United States Marine Corps, requested his resignation from service instead of administrative separation for cause in May 2005.  He also waived his right to a board of inquiry that had been convened to address alleged misconduct on his part from December 2004.  In October 2005, his resignation and waiver were approved, and in November, he was separated from service.  Upon his resignation, his service was characterized as honorable, but the reason for his separation was described as "Unacceptable Conduct."  Fourteen years later, in June 2019, Blount petitioned the Navy to change the reason for his separation to reflect his purported medical disabilities at the time, refer him to have those disabilities evaluated, and to award him back pay and allowances.  The relevant board provided him relief related to the first request. But it concluded that a referral was unwarranted and denied him all other relief.

In September 2021, Blount sued the Secretary of the Navy, challenging the agency's denial of his requests as arbitrary and capricious, unsupported by substantial evidence, and contrary to law.  Both parties now move for summary judgment.  For the below reasons, the Court will grant Defendant's motion for summary judgment and deny Blount's cross-motion for the same.

## I.    Background

### A.    Legal Background

Retired servicemembers may be entitled to pay because of a service-connected disability.

*See generally* 10 U.S.C. § 1401; *Hassay v. United States*, 150 Fed. Cl. 467, 477–78 (2020).  If the

Secretary of the Navy determines that a qualifying servicemember "is unfit to perform the duties

of the member's office, grade, rank, or rating because of [a qualifying] physical disability," "the

Secretary may retire the member[] with retired pay computed under [S]ection 1401."  10 U.S.C.

§ 1201(a).  Such a retirement requires, among other things, that "the disability is of a permanent

nature and stable" and that it "is not the result of the member's intentional misconduct or willful

neglect."  *See id.* § 1201(b)(1)–(2).

Potentially qualifying disabilities are assessed under what the parties call a disability eval-

uation system ("DES").  *See* ECF No. 16 at 17; *see also generally Sissel v. Wormuth*, 77 F.4th 941,

943 (D.C. Cir. 2023); *Havens v. Mabus*, 759 F.3d 91, 93 (D.C. Cir. 2014).  That process begins

with an evaluation as to whether the servicemember needs to be referred to a medical evaluation

board ("MEB").  Under the regulation effective during the relevant time, an MEB may be con-

vened to "evaluat[e] the diagnosis and treatment of a member who is unable to return to military

duty" and unlikely to do so "within a reasonable period of time."[1]  "Any condition that appears to

significantly interfere with performance of duties appropriate to a service member's office, grade,

rank, or rating will be considered for MEB evaluation."  SECNAVINST 1850.4E encl. 8,

§ 8001(e).  If the MEB, too, thinks further evaluation is warranted, "it refers the case to the Phys-

ical Evaluation Board" ("PEB").  *Id.* encl. 3, § 3102(c).  The PEB then finally determines the

---

[1]  Dep't of the Navy, *SECNAV INSTRUCTION 1850.4E* §§ 3102(a), 3104(b) (Apr. 30, 2002) ("SECNAVINST 1850.4E"), https://perma.cc/U9EV-2TCG.

servicemember's "status within the naval service." *Id.* encl. 2, § 2023. Under the operative regulation, "the mere presence of a diagnosis is not synonymous with a disability." *Id.* encl. 2, § 2033. Instead, to find a disability, evaluators "must document how a certain condition constitutes an impairment" "of the ability to perform the [servicemember's] duties." *See id.* encl. 8, § 8001(g).

As relevant to prior disability determinations, the Secretary of the Navy is statutorily empowered to "correct any [naval] record" when he "considers it necessary to correct an error or remove an injustice." *See* 10 U.S.C. § 1552(a)(1). As relevant here, he does so through the Board of Correction of Naval Records ("the Board"). *See id.*; 32 C.F.R. § 723.2. The Board acts under a presumption that officers "have properly discharged their official duties," a presumption overcome only by "substantial evidence to the contrary." 32 C.F.R. § 723.3(e)(2).

### B.   Factual Background

#### 1.   Blount's Service and Separation

Blount enlisted in the Marine Corps in 1994 and was honorably discharged after his term of enlisted service. AR 52. Later, he entered Officer Candidate School before returning to the Marines as a lieutenant. *See* AR 71, 337, 352. He deployed to Iraq in 2003, where he performed grueling ground reconnaissance and air coordination work. *See* AR 203. He recounts witnessing scenes of intense carnage and being repeatedly ambushed, with his unit suffering heavy casualties, including several of his close friends. *See* AR 203–04.

In December 2004, while on leave, Blount visited his parents in Vermont. AR 207. There, upon seeing his father's head bleeding because of a household accident, he experienced what doctors would later characterize as a "traumatic flashback." AR 207–10. He attacked his parents and was arrested and charged with aggravated domestic assault. AR 145, 152. In the days that followed, a "court clinician" opined that, at the time, he was both intoxicated and experiencing a

flashback connected to post-traumatic stress disorder, or PTSD.  AR 210.  Blount eventually pleaded guilty to simple assault, but his conviction was later expunged.  AR 230.

The next year, Blount was assigned to Marine Corps Base Quantico and promoted to captain.  AR 317, 321.  In April 2005, and then again in June, Marine Corps physician Keith Eiche evaluated Blount's fitness for duty and—though noting that he "endorses full criteria for PTSD"—found Blount "does not meet criteria for any . . . mental health condition that would necessitate medical board procedures" and thus is "psychiatrically fit for full duty."  AR 104–06, 110.  At that time, Blount was prescribed 60 mg of Inderal, 60 mg of Prozac, and 50 mg of Seroquel per day.  AR 201.

On May 15, 2005, the Marine Corps filed a Report of Misconduct against Blount over the circumstances of his alleged offense in December 2004.  AR 293–94.  On May 25, a Board of Inquiry required Blount to show cause for his retention in the Marine Corps.  AR 290–91.  At about the same time, Blount's attorney for the then-pending criminal case referred him to a civilian physician, David Rosmarin, who in late June completed an evaluation of his mental state at the time of the alleged offense and noted the severity of his mental condition.  AR 211.  On July 25, Blount petitioned the Marines to reconsider its show cause order given the medical documentation of his PTSD, including Dr. Rosmarin's evaluation, which concluded that Blount was suffering from PTSD and in a dissociated state at the time of the alleged offense.  AR 288–89.  His request was not granted.

A few days later, on July 29, Blount submitted a request to resign instead of facing further administrative proceedings, and waived the Board of Inquiry, rather that submit to it and risk dishonorable discharge.  AR 282, 284, 286–87.  In October, his resignation and waiver were approved, and in November, he was separated from service.  AR 62.  Although Blount's Marine

Corps service was characterized as honorable, the reason given for his separation was "Unacceptable Conduct." *Id*.

### 2.    The Board's Decision

In June 2019, Blount petitioned the Board seeking (1) a change in the narrative reason for his separation to reflect his medical disabilities, (2) that his PTSD be further evaluated, and (3) that he be issued applicable back pay and allowances. AR 28. He argued that relief was appropriate because, he said, his PTSD was not appropriately considered at the time of his separation. AR 28–32.

In July 2020, the Board granted Blount partial relief. AR 2–4. The reason for his separation was changed from "Unacceptable Conduct" to "Secretarial Authority" because, the Board reasoned, "his PTSD diagnosis and the mitigation it offers regarding his misconduct." AR 3. However, the Board determined that changing the reason for his separation to "disability" or referring him further evaluation was unwarranted because "[i]n order to qualify for a disability discharge or be placed on the disability retirement list, a service member must be unable to perform the duties of their office, grade, rank or rating due to a qualifying disability condition." AR 4. And in Blount's case, he "was found psychiatrically fit for full duty six months prior to his discharge from the Marine Corps with no indication he was unable to perform his military duties," and "the only reason he did not continue his military career was due to his misconduct." *Id.* The Board also found that Blount's intoxication was "a significant contributing factor to his misconduct based on his .225 blood alcohol content documented after the incident." *Id*.

The Board relied on, among other things, two psychiatric advisory opinions along with medical documentation, including the reports from both Dr. Eiche and Dr. Rosmarin. AR 3; *see* AR 5–14. Both advisory opinions concluded that Blount was "appropriately found fit for full duty" and that "a finding of medical disability is not supported." AR 5–6. And although Blount

did not meet the military's standards to perform his duties in an overseas assignment "due to pre-scribed medication," the Board found that the evidence otherwise showed that he "remained qual-ified to work in his specialty"—broadly speaking, intelligence—given that he "was able to obtain post-discharge employment in a similar field."  AR 4.  The Board thus denied Blount all other relief.  *Id.*

### C.    Procedural History

In September 2021, Blount brought suit, challenging the Board's decision as arbitrary and capricious, contrary to law, and unsupported by substantial evidence.  ECF Nos. 1, 11.  The parties cross-move for summary judgment.  ECF Nos. 15, 16.  Blount styles his motion as one for judg-ment on the administrative record, rather than a motion for summary judgment, because he asks the Court to determine whether "the factual record is sufficient to support the agency decision . . . to be determined by the Administrative Procedure Act," rather than whether a genuine dispute of material fact precludes summary judgment.  ECF No. 16 at 1, 15.  But because "[s]ummary judg-ment is the proper mechanism for deciding, as a matter of law, whether an agency action is sup-ported by the administrative record and consistent with the APA standard of review," the Court properly construes his motion as a cross-motion for summary judgment.  *Loma Linda Univ. Med. Ctr. v. Sebelius*, 684 F. Supp. 2d 42, 52 (D.D.C. 2010) (citation omitted), *aff'd*, 408 F. App'x 383 (D.C. Cir. 2010).

## II.    Legal Standard

Although both parties move for summary judgment, the ordinary summary-judgment standard does not apply.  Blount "seeks review of agency action under the APA," so the Court "sits as an appellate tribunal."  *Am. Bioscience v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  That is, the Court has no factfinding role because the case presents "a question of law."  *See id.*  It must ask "whether the agency action is supported by the administrative record and otherwise

consistent with the APA standard of review." *Citizens for Resp. & Ethics in Wash. v. SEC*, 916 F. Supp. 2d 141, 145 (D.D.C. 2013). And the APA directs courts to "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2).

Courts "will not disturb the decision of an agency that has examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Ams. for Safe Access v. DEA*, 706 F.3d 438, 449 (D.C. Cir. 2013) (alterations and internal quotations omitted). And a court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974). But a court should not "supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (quotations omitted). And an agency's decision may be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*[2]

---

[2] Blount argues that the Board's decision is subject to "substantial evidence" review under 5 U.S.C. § 706(2)(E). ECF No. 16 at 16. But "this debate is of little consequence." *Open Soc'y Inst. v. U.S. Citizenship and Immig. Servs.*, 573 F. Supp. 3d 294, 316 (D.D.C. 2021). Under precedent binding on this Court, "[w]hen the arbitrary or capricious standard is performing that function of assuring factual support, there is no *substantive* difference between what it requires and what would be required by the substantial evidence test." *Ass'n of Data Processing Serv. Orgs. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677, 683–84 (D.C. Cir. 1984). Thus, the question before the Court, under either standard, is "whether a 'reasonable mind might accept a particular evidentiary record as adequate to support a conclusion.'" *Open Soc'y*, 573 F. Supp. 3d at 316 (quoting *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999)).

Where, as here, the Court reviews the decision of a military corrections board, the agency "is entitled to even greater deference." *Powers v. Donley*, 844 F. Supp. 2d 65, 70 (D.D.C. 2012) (citing *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1514 (D.C. Cir. 1989)).  Congress has given the Secretary of the Navy (and other military departments) broad discretion to "correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1).  Thus, the Secretary may "let even an undisputed error or a conceded injustice stand if he does not believe it necessary to correct it." *Powers*, 844 F. Supp. 2d at 71 (cleaned up).  And when a court reviews the correction of a military record, "[p]erhaps only the most egregious decisions may be prevented." *Kreis*, 866 F.2d at 1515.[3]

## III.    Analysis

The Board's decision that Blount did not qualify for a disability discharge, and that there was no reason to refer his PTSD for further evaluation, was not arbitrary and capricious, unsupported by substantial evidence, or otherwise contrary to law.

The Board's reasoning was straightforward.  It so concluded because Blount "was found psychiatrically fit for full duty six months prior to his discharge from the Marine Corps"—and after he had been charged with assaulting his parents in December 2004—"with no indication he was unable to perform his military duties." AR 4.  To be found "fit," a service member must be "reasonably able to perform the duties of his or her office, grade, rank or rating." SECNAVINST 1850.4E encl. 2, § 2033.  And, the Board noted, although Blount had been diagnosed with PTSD before he resigned from the Marine Corps, "the mere presence of a diagnosis is not synonymous

---

[3] Some courts have expressed doubt as to the exact level of deference due to decisions by military review boards that do not involve "military judgment requiring military expertise." *See, e.g.*, *Hall v. Dep't of Defense*, No. 19-2354 (RJL), 2021 WL 1026123, at *5 (D.D.C. Mar. 17, 2021).  Applying either a heightened standard or normal arbitrary-and-capricious review, the Court comes to the same conclusion.

with a disability;" instead, "[i]t must be established that the medical disease or condition underly-
ing the diagnosis actually interferes significantly with the member's ability to carry out the duties
of his or her office, grade, rank or rating," which was not established in Blount's case.  AR 4.
Thus, he did not "qualify for a disability discharge or be placed on the disability retirement list"
which would require that he be "unable to perform the duties of [his] office, grade, rank or rating
due to a qualifying disability condition."  *Id.*  Nor was there a reason to send him for further eval-
uation.  *Id.*

In reaching these conclusions, the Board thoroughly weighed the many aspects of Blount's
case.  It appropriately considered the psychiatric advisory opinions and medical reports concluding
that Blount was fit for full duty.  AR 3–4; *see Havens v. Mabus*, 146 F. Supp. 3d 202, 216 (D.D.C.
2015) ("[T]he Board may rely on advisory opinions . . . when making determinations" as to a ser-
vice member's disability status.).  The Board credited the opinion of Dr. Eiche, who performed a
mental status exam and noted Blount's PTSD diagnosis, medication regime, and other medical
history, and concluded twice back in mid-2005 that he did not have any mental health condition
requiring further "medical board procedures" and that "he [was] psychiatrically fit for duty."  AR
106–10.  The Board also weighed that after his separation, Blount managed to obtain substantially
similar employment.  AR 4; *see Hall v. Dep't of Def.*, No. 19-cv-2354 (RJL), 2021 WL 1026123,
at *8 (D.D.C. Mar. 17, 2021) (finding that the Board reasonably considered comparable post-dis-
charge employment in evaluating fitness to serve at time of separation).  And it considered, without
apparent objection from Blount, that he himself had passed up the opportunity for a referral for
further evaluation in 2005 by deciding to resign to avoid other potential administrative conse-
quences from the Board of Inquiry.  *Id.* (reasoning that "the only reason he did not continue his
military career was due to his misconduct").

9

Blount criticizes the Board's reliance on Dr. Eiche's opinion that he was fit for duty, arguing the Board "should have seen it for what it was: a relic of a different time where mental wounds weren't approached with the full gravity we now know they require today." ECF No. 16 at 26. But it is not the Court's role to reweigh the evidence before the Board. *See Charette v. Walker*, 996 F. Supp. 43, 50 (D.D.C. 1998) (The "function of [the Court] is not to serve as a super correction board that reweighs the evidence."). And the relevant regulations make clear that a service member with PTSD or other listed condition "is not automatically Unfit and therefore may not qualify for separation or retirement for disability." SECNAVINST 1850.4E encl. 8, § 8001(a)(2). Blount also points to the report prepared by Dr. Rosmarin as supporting his claims. But Dr. Rosmarin did not opine on whether Blount was fit for duty at the time of his separation, and in any event, the Board still considered his report. AR 212–13. In the end, it bears repeating that it is not the Court's role to reweigh the medical evidence in the record, which in this case included not only Dr. Rosmarin's report but also the only physician's opinion on Blount's fitness for duty, and a contemporaneous one at that, which aligned with the Board's conclusion. The Court can easily discern a "rational connection between the facts found and the choice made." *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006) (quoting *State Farm*, 463 U.S. at 43).

Blount also argues that the Board's decision not to refer him to an MEB for a disability evaluation was contrary to law because such referral was mandatory. ECF No. 16 at 17. He argues, in particular, that a referral was mandatory because he had medical conditions then that matched those set forth in the regulations. *See* SECNAVINST 1850.4E encl. 8, §§ 8013(b) (Disorders with Psychotic Features), 8013(d) (Anxiety, Somatoform, Dissociative Disorders). Not so.

First, the regulations Blount points to do not require referral to an MEB just because a servicemember is found to have one of the listed medical conditions, as he says. The regulations

themselves say only that the listed conditions are "cause for referral into the Disability Evaluation System" generally, rather than are cause—more specifically—for referral to an MEB. SEC-NAVINST 1850.4E encl. 8, § 8001(a). Referral to an MEB, rather, requires *some* reason to believe that a servicemember's performance of his duties is impacted by the condition: the regulations say that "[a]ny condition that appears to significantly interfere with performance of duties appropriate to a service member's office, grade, rank, or rating will be considered for MEB evaluation." *Id.* § 8001(e). That makes sense. After all, MEBs are convened to "evaluat[e] the diagnosis and treatment of a member who is unable to return to military duty" and unlikely to do so "within a reasonable period of time." *Id.* encl. 3, §§ 3102(a), 3104(b). For these reasons, a mere finding that a servicemember had one of the listed medical conditions does not automatically require re-ferral to an MEB.

Second, the record did not require the Board to conclude *either* that Blount had one of the medical conditions to which he points *or* that his PTSD appeared to significantly interfere with the performance of his duties. Indeed, the only contemporaneous medical opinion in the record reached the opposite conclusions: that Blount did not have *any* "Axis I mental health condition that would necessitate medical board procedures" and that "he [was] psychiatrically fit for duty." AR 106–10.[4] The record also included psychiatric advisory opinions assessing and concurring in that opinion. AR 5–14. Thus, on this record, the Board did not err in declining to refer Blount to an MEB. *Cf. Fulbright v. McHugh*, 67 F. Supp. 3d 81, 94–95 (D.D.C. 2014) (reasoning that under

---

[4] Axis I are those "Clinical Psychiatric Disorders and Other Psychiatric conditions that may be a focus of clinical attention," part of the diagnosis system "used for all psychiatric conditions that are the subject of an MEB." SECNAVINST 1850.4E encl. 8, § 8013(a)(2).

applicable Army regulations "a MEB is mandatory only when there has been a finding of sufficient severity" such that the particular listed conditions for referral are satisfied).

Finally, the Court notes that the purpose of an MEB referral—to evaluate the health status of a servicemember for fitness for duty—was in any event fulfilled on the record here, even if both the particular form of that evaluation and the outcome are now unsatisfactory to Blount.  And any improper failure to refer to him to an MEB would be harmless "unless it can be shown that the purpose behind [it] went unfulfilled."  *See Ferrell v. United States*, 23 Cl. Ct. 562, 568 (1991) (failure to provide an informal PEB was harmless error).  Blount has not made that showing, especially because he declined to seek further evaluation of his PTSD when he resigned from service almost 20 years ago.  In the end, the Board made its own decision based on a review of Blount's "application . . . and all pertinent evidence of record" that there was no "probable material error or injustice."  32 C.F.R. §§ 723.3(e)(1)–(2).  Applying the appropriate deference to the agency, the Court will not disturb that decision.

## IV.     Conclusion

For all the above reasons, the Court will grant Defendant's motion for summary judgment, and deny Blount's cross-motion for the same.  A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: March 12, 2024